## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

APR 3 0 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**IRIS WOOD,**            )
                         )
    **Plaintiff, *Pro Se***     )
                         )
**v.**                   )    **Civil Action No.**
                         )    **(JURY TRIAL)**
**IRVING KATOR, MICHAEL KATOR,**  )
    **CATHY A. HARRIS,**      )
    **Kator, Parks & Weiser, PLLC,**  )
    **(previously known under other**  )
    **law firm names)**       )
                         )
    **Defendants**            )
                         )

### PLAINTIFF'S 1ST AFFIDAVIT

Iris Wood, the plaintiff, being first duly sworn, states and deposes as follows:

Defendants represented plaintiff in employment matters involving the Library of Congress (LOC) between 1993 and 2006.

Plaintiff's primary concern in 1993 was her being held back from her promotion schedule or promotion ladder to GS-905-13/14/(15) under her mandatory Promotion Plan as part of a recent 1992 reorganization of the Office of General Counsel (OGC) division, office, and team, where she worked at the Library of Congress, a federal institution on Capitol Hill in Washington, D.C., established for the legislative branch under authority of Article I of the Constitution.

The 1992 OGC reorganization had undergone unusually close and strict Congressional oversight. Approval of the OGC budget had come only after several

attempts in previous years by her division chief, John Kominski, to obtain promotion for one employee, Lana Jones; then later, promotions for two employees, Lana Jones and Robert Lincoln, both veteran Library employees and attorneys on his staff, like himself. The Congressionally approved reorganization assigned all permanent employees in the division the same or similar budget provisions, promotion plans, and commensurate position descriptions (PDs) and titles in 1992, regardless of their years of federal or LOC service.

In the end the same two veteran OGC/LOC employees, Lana Jones and Robert Lincoln, were the sole attorney employees who truly benefited to a significant extent from the reorganization and promotions in subsequent years. This outcome was intended all along by John Kominski and the same two employees before the reorganization; and was clearly *not* intended by Congress. The reorganization and use of taxpayer funds at that time was a farcical evasion of clearly stated Congressional intent.

Plaintiff described a hostile work environment to defendants regarding (including but not limited to) her access to promotions and related pay increases, her role and work as a skilled attorney and professional woman, and her request for accommodation for orthopedic surgery needed in light of pain and her history of a birth defect for which she had other major surgery in the past. Plaintiff revealed she also had a bladder condition at that time which she had to explain to her employer despite the embarrassment, because she was being monitored by managers and non-managers, by supervisors and non-supervisors in her office, as part of the hostility.

In 1993 Plaintiff had three degrees highly relevant to her job: a B.A. in Government, a Masters in Public Health (Administration), and a Juris Doctor. She had

2

been one of the first 100 women admitted to the Bar in the history of her home state, her birth defect notwithstanding. in spite of overcoming major surgery and a birth defect as well. At that time she had been licensed to practice law for more than 15 years with approximately 15 years federal service. She was skilled and expert in administrative law, with a coveted specialty in federal procurement and government contract law based upon prior experience.

At the time plaintiff interviewed with OGC/LOC in 1991 she was eligible for GS-905-12/13/14 attorney positions. Robert Lincoln was a male attorney in a GS-905-14 position with more than 20 years LOC service and at that time working in the similar area of administrative and procurement law as plaintiff worked. Plaintiff's expertise approached, and in some aspects equaled or surpassed, those of Robert Lincoln in the specialized field of government contract law.

After plaintiff arrived in OGC/LOC in 1991, two teams were formed. One team handled administrative and contract law matters. It consisted of three members, Robert Lincoln, Beverly Walker, and plaintiff. Under this informal team structure, Robert Lincoln demonstrated novice, if not awkward, abilities as a supervisor or team leader. (As he stated himself, he had worked alone for many years and liked working alone.) Robert Lincoln did not develop a strong working relationship with either woman attorney on his team. He showed passive hostility toward the younger Ms Walker, and direct hostility toward the experienced plaintiff. Nevertheless, all this was overlooked and Robert Lincoln was slated to become the team leader under the upcoming 1992 reorganization.

Ms Walker resigned her position in 1992. This resignation took effect shortly

before the team structure was formalized under the 1992 reorganization approved with Congressional budget oversight. Ms Walker was heard to have said there was "no place" for her in OGC.

During this time Robert Lincoln had sought promotions outside OGC/LOC. He had filed an age discrimination complaint against LOC, which later came to this court as a full-blown lawsuit in approximately 1995. Mr Lincoln appeared to have "had enough" of tolerating and competing with the General Counsel John Kominski whose years of LOC service rivaled his own. Mr. Lincoln also tired of seeing women attorneys with less LOC tenure than himself receive opportunities to advance with promotions before himself or receive promotions faster than himself. Mr. Lincoln resented the course of events and demonstrated his motives in his complaint and lawsuit against LOC which highlighted his age and years of LOC (federal) service.

Specifically, Robert Lincoln demonstrated his motivations of resentment and jealousy of and frustrations with women attorneys who possessed less LOC service than himself. He took personally these circumstances as some form of reverse discrimination, by blocking the promotions, advancement, job growth, and pay increases of plaintiff.

Before plaintiff arrived in OGC/LOC in 1991 Mr. Lincoln was a GS-905-14 and plaintiff was a GS-905-13. By spring 1993 under the office reorganization, Mr Lincoln, a male attorney with similar skills, had received basically two promotions, from GS-905-14 to GS-905-15 to GM-905-15 with large pay increases. (Indeed, Mr. Lincoln skipped grades, jumped with two promotions.) Plaintiff remained as the only staff attorney on the team to support Mr. Lincoln's rise to his first management role, ie, as the only attorney for him to manage or supervise in order to substantiate his liberal promotions. Yet

plaintiff remained a GS-905-12 with no promotions, in face of the Congressionally approved reorganization and Congressionally mandated promotions and promotion plans for all permanent OGC staff.

In short, plaintiff was a pawn in the reorganization; her position and qualifications were used to support Robert Lincoln's grand promotions. The institution and Congress had provided for advancement and increase in pay for all permanent OGC/LOC employees, but in reality, on plaintiff's team the benefits were kept at the top by the manager and for the benefit of the one manager, Robert Lincoln. To underscore the point, the explicit objectives of the reorganization were willfully ignored.

On plaintiff's team the abuse was carried out by John Kominski and Robert Lincoln. Mr Lincoln's double promotion was pre-planned, despite his minimum qualifications as a supervisor, per John Kominski's request.

After defendant Irving Kator first refused to depose John Kominski and Robert Lincoln, and then reluctantly agreed to depose Robert Lincoln, but only in lieu of John Kominski, defendant skirted the real issues of motivations, promotions, and hostility. Defendant incurred the costs of a deposition without ever obtaining any real information from Robert Lincoln, which was the defendant's intention. Defendant did not plan to obtain information from Mr Kominski or from Mr Lincoln. Defendant accomplished that first by not deposing John Kominski, by refusing to do so.

Defendant did not want to draw connections between Mr Lincoln's fervor for promotion to GS or GM-15 in the early 1990's with other job applications and his double promotion in OGC in 1992. Defendant refused to make the historical connection between Mr Lincoln's lawsuit and the 1992 OGC reorganization, between Robert

Lincoln's lawsuit and his frustration and anger about promotions after his long tenure in OGC/LOC. In summary, there was no good faith effort to depose John Kominski or Robert Lincoln on behalf of the plaintiff when defendants had the opportunity to do so in 2004 after their motion to withdraw was rejected.

When plaintiff asked Michael Kator twice why John Kominski had received a "pass," the silence was deafening. When plaintiff asked Irving Kator more than once to depose John Kominski, she received a condescending dismissal of her demands, then an argument.

When plaintiff asked Cathy Harris for all the promotion papers obtained in discovery per her division, plaintiff was told point blank that they did not obtain such things, which pertained to the reason plaintiff first visited their office in 1993.

Plaintiff was expected to consider herself fortunate to be in a "subservient" role in her job with Robert Lincoln, or abandon her federal job and accumulated years of career civil service. When plaintiff began in 1992-1993 to inquire, ask questions, write letters, and ask for meetings about her advancement under the mandated promotion plans under the reorganization, she was not only kicked to the curb and the ditch, but she was also figuratively thrown under the bus. Her career and life were destroyed, her husband's flagging spirit crushed, and everything she and her family had worked for stolen from her.

Plaintiff's initial visit to the EEO office at the Library of Congress was in spring 1993, at the urging and direction of defendant Irving Kator, followed by various visits and lodging informal and formal complaints. Over time several EEO complaints were lodged with the first formal EEO complaint dated April 1994. She also contacted

Congress indirectly about the multiple promotion issues and directly about the interference with her needed surgery.

Plaintiff reported hostility before she complained and went to EEO about promotions. The intensity of the reprisals against her escalated dramatically after she went to EEO and lobbied for her first in a line of slated promotions.

Rather than promote plaintiff under the reorganization, and because plaintiff had less LOC service than Robert Lincoln when he finally obtained his coveted promotion(s), with all her skills plaintiff was falsely accused and labeled as disabled. This was a ruse to oust her from her job only weeks before she would have received the next scheduled review for promotion finally to GS-905-14.

Plaintiff was assigned mental labels, pursued for mental examinations, followed into the parking garage, and set-up for confrontations just prior to surgery, and generally labeled "disabled and unfit for duty," after a life-time of struggling to overcome a birth defect. All this abuse occurred after struggling to overcome a birth defect all her life for which some children fail to survive. When plaintiff was wrongfully dismissed from government service everything was stolen from plaintiff including her health insurance.

Her boss, John Kominski, clenched his fists at her, spit at her, and threatened her, while she nursed her post-operative foot in her office cubicle. Mr Kominski demonstrated how he resented plaintiff having even an open cubicle for an office, as an experienced woman attorney with a masters, doctorate, and license. Later, John Kominski held plaintiff in his office by force and committed battery because plaintiff returned to the office earlier than expected from a doctor's appointment where her birth defect was monitored.

7

It was later learned that John Kominski was suffering from a brain tumor. Yet nothing was done to him in the manner of punishment or fitness for duty (for his temper, misconduct, attacks), as an example of total lack of equal protection for plaintiff, as a woman under Title VII of the Civil Rights Act or under the Americans with Disabilities Act. Instead, plaintiff was punished and suspended so she could never work again in her profession.

During all of this several years of abuse, basically plaintiff lost her temper in public just once. This occurred when she was called in, as a Christian, on the eve of the Christmas Holiday to be told by a Jewish employee that John Kominski planned to transfer plaintiff out of her professional, attorney position to another division PRIOR to plaintiff receiving her next promotion under her mandatory promotion plan as an attorney in OGC/LOC.

The period of time plaintiff maintained her job at LOC, she had to withstand stress and abuse as a heart patient. After overcoming many obstacles in life (a birth defect and major open-heart surgery as well as growing up on a farm) John Kominski and Robert Lincoln (with the help of Sandra Charles) stole everything from plaintiff. If plaintiff had never gotten angry, that would have been the oddity, not that plaintiff did once reveal her righteous indignation over perennial abuse and theft.

The entire scenario involved her immediate interactions with John Kominski. Plaintiff had no warnings or complaints from her internal LOC clients, or from others unrelated and unconnected to the agenda of blocking advancement and promotions within the Office of General Counsel.

Bill Clinton was known to say regarding the 1992 Presidential campaign, "It's all

8

about the economy, stupid!" In other words, by 1992 plaintiff's case was "ALL ABOUT THE PROMOTIONS!"

The record will show that defendants pushed bifurcated grievance procedures forward for years on behalf of the plaintiff, obtained an administrative hearing more than 5 years after plaintiff lost her job and career (2000-2001), and finally filed a complaint in this court approximately 10 years later, CV#03-1343(RMU), in 2003, long after plaintiff was constructively terminated and years after she was actually terminated, making it virtually impossible for plaintiff to be reinstated in her job.

During that time, for example, defendants failed to file an EEO grievance pertaining to plaintiff's termination; failed to develop and investigate her statutory EEO complaints; failed to examine her personnel file (as Irving Kator stated); failed to conduct minimal discovery pertaining to her statutory EEO complaints regarding her pay and promotions and other pay and promotions on her team or in her division; failed to conduct discovery or deposition of John Kominski, the primary abuser who hit plaintiff; refused to conduct deposition of John Kominski, plaintiff's identified abuser, and left the investigation to plaintiff of Kominski's availability as a member of the MD Bar in good standing and still practicing law part-time in 2003-2004 and currently AND STILL REFUSED TO CONDUCT DEPOSITION OR EVER PLACE JOHN KOMINSKI UNDER OATH. By failing to ever put John Kominski under oath, the defendants behaved collusively and disloyally by treating plaintiff's abuser as a sacred cow. Defendants failed during investigation and discovery to pursue important issues with Robert Lincoln and colleagues such as Brad Weiss and others such as Sandra Charles, all involved in the escapades against plaintiff.

. Brad Weis was held back as a primary witness for eleven (11) YEARS! Not even his notes were required to be produced.

Defendants failed to pursue plaintiff's statutory EEO complaints through all court appeals with the U.S. Court of Appeals, leaving some needlessly undeveloped for the record and totally devoid of statutory EEO arguments.

None of this is acceptable by any standard of duty, much less the standard applied to specialist in employment law and specialist in litigation.

Defendants' efforts will show that they made an intentional decision to change Irving Kator's approach to the case. They intentionally pursued a constitutional, due process argument in plaintiff's case based upon a weak *AFSCME Union* case which hardly applied to plaintiff, who all along was denied union participation by the nature and status of her job. Furthermore, the case was both erroneously interpreted and applied to plaintiff's facts. A simple call to Union lawyers about the case would have revealed its inherent weaknesses and inapplicability. This misplaced authority was the foundation of the constitutional, due process arguments used to uphold about 10 years of legal arguments in plaintiff's case. This blind alley extracted time and distracted from the plaintiff's life -- time that could have been better spent on plaintiff's health, on her dying parents, on her ill and dying husband.

The approach defendants chose against plaintiff's wishes was changed to avoid confrontation with those individuals guilty of abuse, the defendants' collusive fellow professionals and colleagues. Sterile and procedural arguments were preferred to confronting the perpetrators, colleagues and professionals with the true issues of hostility and abuse.

This deflective tangential argument was employed to the detriment of plaintiff's original complaints of statutory EEO claims. Even if one looks away from the original pay and promotion issues, the glare of retaliation was extreme. Yet the individuals behind the reprisals were never required to answer for their actions or motives.

What is worse is that the case history reveals that such constitutional and union case arguments were pursued at the sacrifice of available statutory EEO arguments, adequate investigation, competent case development, and meaningful discovery. Zealous pursuit of plaintiff's statutory EEO complaints was pitifully neglected. Defendants intentionally avoided confrontations with their collusive individual colleagues and professionals at LOC, which reveals an underlying conflict of interest by all defendants.

Defendants deliberately gave preference to the cold, sterile procedural arguments of constitutional due process, allowing this plaintiff's case to drag on for years. This happened because defendants focused on no one individual wrongdoer who had injured this plaintiff. That deliberate choice caused no direct confrontations between plaintiff's counsel and their colleagues at the bar, their fellow professionals. This unzealous behavior affected and enhanced defendants' abilities to reach easier, more favorable settlements in their other cases pending against government agencies.

Clearly, if defendant wanted to know more about the General Counsel, John Kominski's commitment to plaintiff when she was hired, that indeed she did have job protection and appeal rights in her permanent job, the best avenue would have been to depose him and ask him about the understanding about job protection for permanent employees in his division and under the Office of the Librarian.

Defendants allowed plaintiff's case to be painted, at best or worst, as an example

of "assassination by committee." In fact, defendants knew it was an ugly, personal case of targeted, illegal hostility against a skilled professional woman and theft of everything her life stood for as a trailblazer in her profession and "over-comer" with a birth defect, which were perpetrated by John Kominski, Robert Lincoln, and their allies.

John Kominski helped Robert Lincoln crush someone's life, for no better reason than Robert Lincoln's mounting and total frustration with multiple factors at his LOC workplace, largely caused by John Kominski! Robert Lincoln was allowed to crush someone's life. He was allowed to target someone and destroy plaintiff's life and career, to satisfy his greed for promotion, recognition, more money, and for his need to punish someone for his many frustrations at LOC, including lashing out at professional women. For no better reason than "someone had to pay" for his frustrations and feelings of loss for not being promoted for years and seeing professional women sponsored for advancement with less years of service than himself, plaintiff's life and career were targeted, shredded, and figuratively chopped up by John Kominski, Robert Lincoln, and their allies.

Plaintiff overcame great obstacles, a birth defect, growing up on a farm in the south, uneducated parents, to make a career which was stolen from her by John Kominski and Robert Lincoln and their cohorts. Some do not survive plaintiff's original obstacles in life. Much is taken away as a handicapped person in out society, such as having children of ones own. The one thing plaintiff had was her work and role in society as a professional. John Kominski and Robert Lincoln have never even revealed under oath the original source of their hostility, not after 15 years, why they figuratively stomped her into "invisibility."

Defendants failed to bring out any of this highly relevant motivation demonstrating intentionality and willfulness. Defendants failed to even confront plaintiff's abusers, to make any demands of them. John Kominski, a classic abuser for years, never spent one hour worried about testimony because defendants insulated him.

Granted in many legal malpractice cases, the "case within a case," is about "crunching numbers," as securities cases, accounting and property issues, even investigating assets in a domestic case. This case was much about investigating and doing effective discovery to ferret out the source and means and actors and acts of hostility. This is very different from getting an accountant, until all the years of lost pay, promotions and pay increases, insurance and leave benefits, and retirement need to be computed.

Even that does not address the loss of participation in life which is so often the discrimination and abuse inflicted upon those in society who are viewed as disabled, as born "short," as born damaged, as plaintiff was born with a birth defect and defendant never asserted it as an issue, a complication, or a stressor. In this case, employer tried to change the subject by stressing the plaintiff with new medical labels, after she struggled to overcome a birth defect and medical labels her whole life. Back-pay does not make up for being crushed into submission, into being "invisible" in this society, withdrawn from public life with a birth defect or a false label, without use of ones skills, "invisible", "unemancipated," and not allowed to "participate" in life and society. This is the abuse committed by demented individuals like Robert Lincoln and John Kominski upon other individuals more vulnerable or less powerful than them. Surely, defendant knew how to bring out some of this as experienced litigators, but instead declined to effectively

13

confront plaintiff's abusers.

The "case within a case" in plaintiff's statutory EEO claims was never zealously investigated or developed, nor adequate discovery performed.

What defendant chose to do, instead of performing discovery and investigation zealously, was to threaten plaintiff with withdrawal. Damned if you do, damned if you don't. If withdraw, no one can assist with a case over 10 years old and a product of the first attorney's strategy and approach. The other ultimatum was a forced settlement which was clearly structured to show up plaintiff's refusal to lie and claim a false disability which would never have been approved anyway. In furtherance of this course, defendants drafted and demanded plaintiff sign not one, but a series of retainer agreements.

Defendant so pressured plaintiff until it was impossible to study any offer, because resources had to go into keeping on the job the only attorney-defendants who developed a 10+ year "attrition strategy" in this case.

Clearly, the public proposal to withdraw by its own architect made it impossible for anyone, including the judge, to believe plaintiff's case was worthy of moving forward. Defendants made it impossible for any positive result, again, forcing settlement.

Plaintiff later learned the real reason for a forced settlement was defendant's lack of zealous investigation and discovery. With settlement, light would never shine on the fact that John Kominski was given a "pass," promotions were never reviewed, and details behind retaliation and set-ups were never investigated and uncovered. Sandra Charles conducted a "Russian gulag" for years at LOC after she departed St Elizabeth's Hospital under controversy, but she was never pursued. Phone records and details behind Sandra

Charles waiting for plaintiff in the parking garage before plaintiff's surgery were never investigated. John Kominski was never questioned under oath about sending a message to Sandra Charles to follow plaintiff into the garage before her surgery. After plaintiff returned from surgery, John Kominski never answered for a large plastic rodent found on plaintiff's filing cabinet as John Kominski exited the office. The large plastic rodent was exhibited at plaintiff's administrative hearing in 2000.

If these examples of hostile work environment are not impressive, then consider the classic EEO situation where a less experienced male comes into an office and receives training from a more experienced woman and then is promoted above her or given her job. Such is the situation for plaintiff when Gary Greenfield who had never served in a permanent or full time attorney job, was brought in to replace plaintiff. Discovery of internal OGC data was needed to show evidence of traditional sex discrimination.

Further the affiant saith not.

*[signature]*

Iris Wood, Plaintiff *Pro Se*


STATE OF SOUTH CAROLINA

COUNTY OF _Sumter_____, to-wit:

The foregoing pleading was sworn to, subscribed, and acknowledged before me by Iris Wood on the 6th Day of September, 2007.

Notary Public

My commission expires:  My commission expires April 27, 2011

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRIS WOOD,<br><br>    Plaintiff, *Pro Se*<br><br>    v.<br><br>IRVING KATOR, MICHAEL KATOR,<br>    CATHY A. HARRIS,<br>    Kator, Parks & Weiser, PLLC,<br>    (previously known under other<br>    law firm names)<br><br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 07-1597 (RMU)<br>    (JURY TRIAL DEMANDED) |

## PLAINTIFF'S 2ND AFFIDAVIT

Iris Wood, plaintiff, affirms under oath, as follows:

Plaintiff pro se is not admitted to practice law in this court and is not admitted to practice law in local courts in the Washington, DC, area. Plaintiff pro se is not experienced or expert in trial work or legal malpractice or employment law case work.

*[signature]* 4-29-2008

Iris Wood, Plaintiff *Pro Se*

*[signature]* Notary Expires 10-17-2014

Certificate of Service

I hereby certify that a copy of the foregoing are served by first class mail on:

Adrienne Tranel, Esq
Kator, Parks & Weiser, PLLP
1200 18th Street, NW, Tenth Floor
Washington, DC 20036

Iris Wood, pro se
Date: 4-29-2008